**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| K.G. (said name being a pseudonym used to protect the identity of the victim) by her guardian and mother, and B.G. (said name being a pseudonym used to protect the identity of the victim), | No. 1:17-cv-8118 |
| Plaintiffs, | **OPINION** |
| v. | |
| OWL CITY, *et al*, | |
| Defendants. | |

---

**APPEARANCES**:

Scott Leonard
LEONARD LEGAL GROUP, LLC
165 Washington Street
Morristown, NJ 07960

    *On behalf of Plaintiffs.*

Lawrence S. Lustberg
Anne M. Collart
GIBBONS, PC
One Gateway Center
Newark, NJ 07102-5310

    *On behalf of Defendants.*

**O'HEARN, District Judge.**

    This matter comes before the Court on a motion for summary judgment and a motion to preclude the expert report and testimony of Plaintiffs', K.G. and B.G., expert witness by Defendants Adam Young, Owl City, Sky Harbor Touring, Inc. ("Sky Harbor Touring"), and Sky Harbor Entertainment, Inc. ("Sky Harbor Entertainment") (collectively, "Defendants"). (ECF Nos.

112–13). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, Defendants' Motion to Preclude Plaintiffs' Expert is **GRANTED** in part and **DENIED** in part and the Motion for Summary Judgment is **GRANTED** in its entirety.

## I.     BACKGROUND[1]

### A.  Owl City's History with Jorgensen and K.G.

In 2007, Young, a songwriter and instrumentalist, founded Owl City. (Def. SOMF, ECF No. 112-2 ¶¶ 1–2). After Owl City gained popularity, Young created Sky Harbor Touring in 2009, which pays contract musicians to perform for Owl City while on tour. (Def. SOMF, ECF No. 112-2 ¶ 3). Young also owns Sky Harbor Entertainment, which serves as the umbrella company for Young's artistic endeavors outside of touring. (Def. SOMF, ECF No. 112-2 ¶ 4).

Back in 2005, before Young founded Owl City and was in a different band, he met Daniel Jorgensen,[2] a musician in another band. (Def. SOMF, ECF No. 112-2 ¶ 8). Young and Jorgensen became acquaintances when the two bands toured together. (Def. SOMF, ECF No. 112-2 ¶ 8). In 2009, Sky Harbor Touring hired Jorgensen to sell merchandise during Owl City's tour. (Def. SOMF, ECF No. 112-2 ¶ 9). Then in January 2010, Jorgeson was hired as a contract musician for Owl City. (Def. SOMF, ECF No. 112-2 ¶ 11). As a touring musician for Owl City, Jorgensen had to accept that the tour would be alcohol and drug free. (Def. SOMF, ECF No. 112-2 ¶ 18). Additionally, to be a touring musician for Owl City, Jorgensen could not have a criminal record. (Def. SOMF, ECF No. 112-2 ¶ 18).

In September 2012, K.G., then thirteen years old, met Jorgensen, then twenty-seven years old, at an Owl City concert she attended with her mother, B.G. (Def. SOMF, ECF No. 112-2 ¶¶

---

[1]  The facts set forth herein are undisputed unless otherwise noted. To the extent facts remain in dispute, the Court finds that they are immaterial to its legal analysis.

[2]  Jorgensen is also a named Defendant but he has not moved for summary judgment.

2

23–24). Thereafter, K.G. and Jorgensen began communicating over Facebook messenger. (Def. SOMF, ECF No. 112-2 ¶ 27). Over time, the conversations, over Facebook messenger and other methods, turned sexually explicit. (Def. SOMF, ECF No. 112-2 ¶ 28). During this time, K.G. attended Owl City concerts. (Def. SOMF, ECF No. 112-2 ¶ 32).

On August 29, 2013, K.G. attended the Owl City concert in Atlantic City, New Jersey. (Def. SOMF, ECF No. 112-2 ¶ 34). She had driven down the day before with B.G. (Def. SOMF, ECF No. 112-2 ¶ 35). K.G. spent the day of the concert with Jorgensen, both before and after the concert, during which they kissed on a public beach. (Def. SOMF, ECF No. 112-2 ¶ 36).

On December 26, 2013, K.G. posted a blog on Tumblr detailing her experiences with Jorgensen. (Def. SOMF, ECF No. 112-2 ¶ 39). That day, Young's personal manager, Steve Bursky, learned of K.G.'s blog post and contacted Jorgensen, who admitted that there was some truth to K.G.'s allegations. (Def. SOMF, ECF No. 112-2 ¶¶ 40, 43). Bursky then alerted Young, who terminated Jorgensen's contract. (Def. SOMF, ECF No. 112-2 ¶ 43). Jorgensen ultimately pled guilty to lewdness in 2017. (Def. SOMF, ECF No. 112-2 ¶ 43).

Plaintiffs allege claims of assault, false imprisonment, and intentional and negligent infliction of emotional distress against Jorgensen. (Am. Compl., ECF No. 47, ¶¶ 118–40). As to Defendants Young, Owl City, Sky Harbor Touring, and Sky Harbor Entertainment, Plaintiffs allege negligent hiring, retention, and supervision (Count Four), gross negligence (Count Five), and a *per quod* claim on behalf of B.G. (Count Six). (Am. Compl., ECF No. 47, ¶¶ 141–89).

**B.   The Report and Deposition of Plaintiffs' Expert, Clinton F. Billups, Jr.**

Plaintiffs retained a liability expert, Clinton F. Billups, Jr., who authored a report evaluating the "trade, customs, practices, and usage of the concert touring industry," and

Defendants' duty of care in this case. (Billups Rep., Def. Br., Lustberg Cert., Ex. 21). On October 13, 2022, Billups was deposed. (Billups Dep., Def. Br., Lustberg Cert., Ex. 22).

Billups has over fifty years of experience in the entertainment industry. (Billups Dep., Def. Br., Lustberg Cert., Ex. 22 at 74:21–75:10). Specifically, he managed a high school band in the 1970s, a classical music piano duo in the 1990s, and currently represents a musical quartet which does not currently tour. (*Id.* at 38:20–40:12; 85:25–88:14; 91:13–17). He has also managed performers such as magicians, ventriloquists, and comedians, among other types of performers. (*Id.* at 85:22–24). He also toured as a magician himself at college campuses until the mid-1970s. (*Id.* at 40:16–44:16). Since then, Billups has attended many entertainment-related conferences including the International Entertainment Buyers Association, which relates to the touring entertainment industry, the Global Gaming Association, the International Association of Fairs and Expositions Conference, which is the trade association for entertainment buyers for state and county fairs, among other touring music industry conferences. (*Id.* at 48:7–23). Billups has been the president of the National Conference of Personal Managers ("NCPM") since 2002, whose members include managers for all types of entertainment clients, including recording artists. (*Id.* at 95:23–98:16). He has served as an expert on thirteen separate proceedings relating to his role as a personal manager and disputes between artists and managers. (*Id.* at 114:7–135:6).

Based on his experience, he opines that "[i]t is an entertainment industry trade custom, practice, and usage that there is a duty to use reasonable prudence in hiring employees or independent contractors to protect customers, fans, etc. from foreseeable risks, especially for . . . any . . . entity whose market base includes minors, such as a band." (Billups. Rep., Def. Br., Ex. 21 at 24). Billups opines that Defendants should have known that "allowing band members and crew unsupervised meetings and access to female minor fans would expose their minor fans to

foreseeable harm, including sexual exploitation. . . ." as the "music touring industry has a decades-long history of sexually exploiting minors." (*Id.*). Because of this, Billups concluded that Defendants were "negligent, grossly negligent, and reckless in the hiring, retention, and supervision of [Jorgensen.]" (*Id.*).

## II.   PROCEDURAL HISTORY

On October 11, 2017, Plaintiffs commenced this action, naming other Defendants, in addition to Young, Owl City, and Jorgensen. (ECF No. 1). Following a Motion to Dismiss, (ECF No. 11), which was granted in part, (ECF No. 31), this Court dismissed the Complaint as to Young and Owl City but permitted Plaintiffs to file a motion for leave to amend. (ECF No. 31). On February 14, 2020, Plaintiffs filed an Amended Complaint. (ECF No. 47). Thereafter, on December 23, 2021, Plaintiffs filed a second Amended Complaint, which added claims against Sky Harbor Touring and Sky Harbor Entertainment, in addition to Young, Owl City, and Jorgensen. (ECF No. 83).

On October 27, 2022, Defendants filed the present summary judgment motion. (ECF No. 112). The following day, Defendants moved to exclude Plaintiffs' expert. (ECF No. 113). Plaintiffs filed separate oppositions to the motions on December 12 and 14, 2022. (ECF Nos. 120–21). Defendants filed replies on January 20, and February 16, 2023. (ECF No. 126, 132).

## III.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [her] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once met, the burden shifts to the nonmoving party to "go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(a)). To withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249–50). Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.

IV.    **DISCUSSION**

### A.  Motion to Preclude Plaintiffs' Expert

Defendants have moved to preclude Plaintiffs' expert, Clinton Ford Billups, Jr. Defendants argue that Billups' expert report and testimony fails to meet the standards of reliability required as he lacks the requisite qualifications to support his opinions, he does not base his opinions on reliable principles or methodologies, he improperly opines on legal duties, and he recites a legal conclusion. (Def. Br., ECF No. 113-1 at 12–13). The Court agrees in part and disagrees in part. Specifically, to the extent that Billups' testimony is not supported by the record or opines on a legal conclusion, that testimony is inadmissible.

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Daubert* and Rule 702 require courts to determine the admissibility of expert testimony in light of three factors: (1) the qualifications of the expert; (2) the reliability of the expert's methodology and the application of that methodology; and (3) whether the testimony fits the matters at issue in the case. *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli I*), 35 F.3d 717, 741–43 (3d Cir. 1994). The Third Circuit has noted that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence," and there is a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli II*), 916 F.2d 829, 856 (3d Cir. 1990) (internal quotations and citations omitted). Yet, the Court has an "obligation to insure that only reliable and relevant expert testimony be presented to jurors." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 111–12 (3d Cir. 2020).

7

1.  Billups' Qualifications

Turning first to Billups' qualifications, Defendants argue Billups is not qualified to opine on the standards and practices of the music touring industry from 2009 to 2013. (Def. Br., ECF No. 111–13 at 12). In turn, Plaintiffs argue Billups is more than qualified to render an opinion given his decades of experience in the entertainment industry and that Defendants' criticisms as to his qualifications go to the weight and not the admissibility of his opinions. (Pla. Br., ECF No. 120 at 9).

With regard to the qualifications prong, the Court of Appeals has explained that an expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli I*, 35 F.3d at 741. Indeed, the Third Circuit has "been satisfied with generalized qualifications." *Id*. In fact, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have specialization that the court considers most appropriate." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). While Defendants maintain that Billups' over fifty-year career in the entertainment industry is not specifically within the "music concert touring industry," (Def. Br., ECF No. 113-1 at 12–13), the Court does not view the requisite experience so narrowly.

Here, Billups, who has over fifty years' experience in the entertainment industry as both a performer, manager of various artists, including musical artists, and as the President of the National Conference of Personal Managers since 2002, is sufficiently qualified to render an opinion as to entertainment industry standards. While Billups' own practical experience touring as an entertainer may be limited, he has extensive training and credentials in the entertainment industry to qualify

as an expert witness. *See Hammond v. International Harvester Co.*, 691 F.2d 646 (3d Cir. 1982) (concluding automobile and agricultural equipment salesperson who taught high school automobile classes qualified as an expert in a personal injury case involving a tractor). And "[a]ny argument [that the expert's] education, experience, or training does not provide a viable industry standard goes to the weight of his testimony, not its admissibility." *Christoforetti v. Bally's Park Place, Inc.*, No. 12-4687, 2021 WL 3879074, at *6 (D.N.J. Aug. 31, 2021). That is the case here with respect to Defendants' arguments that his generalized experience is not sufficient.

2. <u>Reliability of Billups' Opinions.</u>

Next, Defendants argue Billups' proffered opinions are not the product of reliable principles or methodologies and are based on his subjective beliefs and speculations. (Def. Br., ECF No. 113-1 at 16). Plaintiffs maintain that Billups utilized accepted standards and practices learned through his experiences, education, industry publications, and informal resources. (Pla. Br., ECF No. 120 at 11).

In certain circumstances, admissible expert testimony may derive from an expert's knowledge and experience. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000). Indeed, in non-scientific cases, such as here, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Thus, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 152. In other words, "[c]ases where courts have allowed testimony based on the experience of the expert often involve testimony as to custom and practice that has been acquired via such experience." *Grande Vill. LLC v. CIBC Inc.*, No. 114-3495, 2018 WL 3085207, at *2 (D.N.J. June 22, 2018) (quoting *W. Am. Ins. Co. v. Jersey Cent. Power & Light Co.*, No. 03–6161, 2008 WL 5244232, at *8 (D.N.J. Dec. 15,

2008)). Courts have "considerable discretion" in making these reliability determinations. *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002). Additionally, the Supreme Court observed in *Daubert* that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Here, Billups relies on his review of various publications and the record, supported by his over fifty-year experience in the entertainment industry, including having attended and participated in many entertainment-related conferences. (Billups Rep., Def. Br., Lustberg Cert., Ex. 21 at 3–7; Billups Dep., Def. Br., Lustberg Cert., Ex. 22 at 48:7–23). In light of the Court's considerable discretion and the non-scientific nature of this case, the Court concludes that Billups' report and testimony is based upon sufficiently sound principles. Indeed, reviewing Billups' testimony, it is apparent his opinions on the customs of the touring industry, while admittedly quite general, relied on his experiences in the industry and his review of the evidence. *See Christoforetti*, 2021 WL 3879074, at *6–7 (explaining expert's opinion based on thirty-year experience working in hotel and lodging industry and extensive review of evidence and publications supports reliability of opinion); *Reilly v. Vivint Solar*, No. 18-12356, 2020 WL 3047546, at *4 (D.N.J. June 8, 2020) ("While [the expert's] methods are not necessarily explained in detail, he adequately explains how he will apply his experiences to the facts of this case to render opinions" and thus "such methods and experiences render [the expert] capable of opining on the issues of general privacy background and standards relating to acceptable, industry-standard practices for privacy policy implementation and execution."); *States v. Fernwood Hotel & Resort*, No. 12-0906, 2014 WL 198568, at *3 (M.D. Pa. Jan. 15, 2014) (explaining thirty-nine years of personal and practical experience with glass

products, including serving as a glass consultant, supported the reliability of the expert's opinion). As such, his opinions meet the reliability requirement.

    3.  <u>Fit</u>

    Finally, Defendants maintain that Billups' testimony will not assist a trier of fact as he bases his opinions on facts that do not exist or assumptions that are belied by the record. (Def. Br., ECF No. 113-1 at 26). Specifically, Defendants take issue with Billups' testimony as to Defendants' knowledge of Jorgensen's misconduct, failure to train and supervise Jorgensen, hiring procedures, legal standards and legal duty of care, and standard policies and procedures. (Def. Br., ECF No. 113-1 at 27–33). Plaintiffs argue that Billups' opinions are entirely supported by the record. (Pla. Br., ECF No. 120 at 16).

    Federal Rule of Evidence 702 requires that the expert's "bear enough of a relation to the facts and issues of the case to be of aid to the jury in resolving a dispute of fact." *Dzielak v. Whirlpool Corp.*, No. 21-20089, 2017 WL 1034197, at *13 (D.N.J. Mar. 17, 2017). But this is not a high standard. *In re Paoli I*, 35 F.3d at 745. Yet, while the standard is not a particularly "high standard," an expert's testimony must be based on the factual record. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

    To the extent that Billups' testimony is not supported by a factual foundation in the record, that testimony is inadmissible. Specifically, as Defendants argue, the following testimony is not supported by a factual foundation and is therefore inadmissible: that Young was aware of other young women that Jorgensen had met on the road, (Billups. Dep., Def. Br., Lustberg Cert., Ex. 22 at 283:12–19), that Young deleted a comment on Owl City's Instagram made by a mother of a young female fan who had allegedly been solicited by Jorgensen, (*id.* at 215:6–11), speculation that all artists monitor every comment on their social media pages, (*id.* at 294:23–295:5), inferring

that Young and Jorgensen had conversations about K.G., (*id.* at 284:14–17), and that Jorgensen's inappropriate actions were foreseeable, (Billups Rep., Def. Br., Lustberg Cert., Ex. 21 at 25). Not only was Billups unable to specify what factual evidence he was relying upon when making the above opinions, the Court finds they are all plainly unsupported by the record. Thus, Defendants' Motion to Preclude is granted as to this testimony.

However, Billups' testimony with regards to the standard practices of the touring industry with respect to interactions with minor fans based on his vast experiences in the entertainment industry could assist the trier of fact and thus is admissible. Indeed, as noted, given Billups' fifty-year long career in the entertainment industry, his opinions on the standards of care in the industry based on his lived practical experiences could certainly aid a trier of fact.

Finally, to the extent that Billups opines on a legal conclusion in his report and testimony—whether Defendants owed a duty of care to K.G. and whether they breached that duty—those portions of his testimony and report are clearly inadmissible. *See Mastripolito v. Jefferson Health-New Jersey*, 583 F. Supp. 3d 622, 626 (D.N.J. 2022) (noting experts may "opine on established industry customs and standards, provided the testimony stops short of defining the legal duties arising from industry customs or opining on whether the defendant has complied with those duties.") (citation omitted)). Specifically, here, Defendants are correct that Billups' report and testimony includes opinions, which usurp the role of the Court in determining whether Defendants owed K.G. a duty of care. Specifically, Billups opines that Defendants did, in fact, fail to use reasonable care in the hiring, retention, and supervision of Jorgensen, and breached their duty of care to K.G. (Billups Rep., Def. Br., Lustberg Cert., Ex. 21 at 24–29). *See Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *8 (E.D. Pa. May 4, 2011) ("First, to the extent [the expert] plans to testify that [defendant] behaved negligently in the conduct of its business, such testimony

constitutes an improper legal opinion."); *Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir.2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion.")(citation and internal quotation marks omitted)).

In summary, Defendants' Motion to Preclude is granted in part and denied in part.

**B.  Summary Judgment**

Defendants have moved for summary judgment on Counts Four, Five, and Six under Federal Rule of Civil Procedure 56(a), arguing that Plaintiffs are unable to establish that Defendants owed a duty of care in this case, heightened or otherwise, because they did not know or have reason to know of Jorgensen's dangerous attributes. (Defs. Br., ECF No. 112-1 at 12–25). Additionally, even if they had such a duty, Defendants argue that Plaintiffs cannot prove breach or causation. (Defs. Br., ECF No. 112-1 at 22–25). Finally, Defendants argue that B.G.'s individual *per quod* claim, which is derivative of K.G.'s claims, would necessarily fail. (ECF No. 112-1 at 28). After reviewing the record, the Court concludes that Defendants are entitled to summary judgment on Counts Four, Five, and Six.

1.  Defendants are Entitled to Summary Judgment on Plaintiffs' Negligent Hiring, Retention, and Supervision Claim.

In Count Four of the Amended Complaint, Plaintiffs allege that Defendants failed to use reasonable care in the screening, selection, hiring, retention, and supervision of its employees, which allowed Jorgensen to engage in inappropriate relationships with underage female fans. (Am. Compl., ECF No. 83, ¶¶ 148–179).

Under the theory of negligent hiring and retention, "[a]n employer is potentially liable to a third party whose injury was proximately caused by the employer's negligence in hiring or retaining an employee who is unfit for the job." *Maddox v. City of Newark*, 50 F. Supp. 3d 606,

636 (D.N.J. 2014) (citing *DiCosala v. Kay,* 450 A.2d 508, 514 (N.J. 1982)). There are two requirements to establish a prima facie case of negligent hiring and retention. First, the employer must have had knowledge that the employee is dangerous or unfit. *Lingar v. Live-In Companions, Inc.*, 692 A.2d 61, 65 (N.J. App. Div. 1997). Second, through the employer's negligence in hiring the employee, the employee's dangerous characteristics or unfitness must have caused the injury. *Id.* "To be foreseeable, the injury must be within a general 'zone of risk' created by the employee's conduct." *Maddox,* 50 F. Supp. 3d at 636 (*quoting DiCosala*, 450 A.2d at 517). A plaintiff, thus, must show that the person's prior conduct somehow foreshadowed the actual harm she suffered. *Id.* (citing *DiCosala,* 450 A.2d at 516–17). Additionally, "[w]hether a duty exists is ultimately a question of fairness." *Goldberg v. Housing Auth. of Newark,* 186 A.2d 291, 293 (N.J. 1962).

Similarly, to prove negligent supervision, "Plaintiff must show a dispute of material fact concerning whether Defendant should have reasonably foreseen that its employees would injure a customer during the performance of their duties." *Brijall v. Harrah's Atl. City*, 905 F. Supp. 2d 617, 621 (D.N.J. 2012) (citation omitted). And "[u]ltimately, while the factual record is viewed under the summary judgment standard, whether a defendant owes a legal duty to another and the scope of that duty, are generally questions of law for the court to decide." *G.A.-H. v. K.G.G.*, 210 A.3d 907, 914–15 (N.J. 2019) (internal quotation marks and citation omitted).

In *Dicosala*, the New Jersey Supreme Court addressed whether the Boy Scouts of America negligently hired and retained an employee who accidentally shot an underage guest at his employer-issued housing. 450 A.2d at 510. In holding that the Boy Scouts did, the Court explained that:

> The question presented is whether the employer, *knowing of its employee's unfitness*, incompetence or dangerous attributes when it hired or retained its employee, should have reasonably foreseen the likelihood that the employee through his employment would come into contact with members of the public, such

as the plaintiff, under circumstances that would create a risk of danger to such persons *because of the employee's qualities*.

*Id.* at 518 (emphases added). The Court determined that the record "disclose[d] facts indicative of the foreseeability of the accident which actually befell plaintiff and which would support liability," including that the Boy Scouts knew the employee possessed and used guns and lived in housing on the Boy Scout Camp's premises that was part of the common facilities used by visitors. *Id.* The Court explained that it was foreseeable that the employee would entertain guests in his home. *Id.* As such, "plaintiff clearly was exposed to the 'enhanced hazard' and fell within the 'zone of risk' created through defendants' employment of [the employee] and the dangerous condition that existed at the [the employee's] home which was furnished as part of his employment." *Id.*

Here, Plaintiffs allege that Defendants generally owed a duty to K.G. as a minor female fan.[3] (Am. Compl., ECF No. 83, ¶¶ 148–179). Plaintiffs also argue that Defendants owed K.G. a heightened standard of care as she was a minor in the entertainment setting. (Pla. Br., ECF No. 121 at 22). The Court disagrees.

Undoubtably, the Court recognizes the State's interest in protecting children, particularly from sexual abuse. *See, e.g., Hayward v. Salem City Bd. of Educ.*, 2016 WL 4744132, at *11 (D.N.J. Sept. 12, 2016). However, Plaintiffs fail to identify any case in which a heightened standard

---

[3] In response to Defendants' Motion, Plaintiffs argue that K.G. may also be considered a business invitee but failed to provide any caselaw or analysis to support this argument. (Pla. Br., ECF No. 121 at 24). Under New Jersey law, "[b]usiness owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is in the scope of the invitation." *Nisivoccia v. Glass Gardens, Inc.,* 818 A.2d 314 (N.J. 2003). Indeed, "[t]his duty arises out of the fact that business owners 'are in the best position to control the risk of harm. Ownership or control of the premises, for example, enables a party to prevent the harm.'" *Jarrah v. Trump Hotels & Casino Resorts, Inc.*, 487 A. Supp. 2d 522, 526 (D.N.J. 2007) (quoting *Kuzmicz v. Ivy Hill Park Apartments, Inc.,* 688 A.2d 1018, 1021 (1997)). Given that many of the interactions alleged here did not even take place at Owl City's concerts or could be considered within the scope of the invitation, the Court rejects this argument.

duty of care was applied to minors in the entertainment industry, as they are suggesting the Court impose here.

Moreover, this case is not entirely on all fours with *Lingar v. Live-In Companions*, on which Plaintiffs relies. 692 A.2d 61. First, there, the court took note of the critical work performed by Live-In Companions' employees in that they were tasked with going to disabled individuals' homes to care for them. *Id.* at 66. Second, the court noted that the customers were commonly helpless and ripe for abuse. *Id.* Third, it considered that the employment form, which the court described as "sketchy and meager," was insufficient to "yield adequate information pertaining to the applicant's background, criminal history and experience." *Id.* And finally, the court considered the fact that had Live-In Companions done a proper investigation, it would have discovered the employee's multiple violations of the law and his overall lack of fitness. *Id.*

Unlike *Live-In Companions*, here, Defendants hired Jorgensen to sell band merchandise and later as a contract musician. Thus, the work Defendants hired him to do was nowhere near as critical and sensitive as that performed by the employees of Live-In Companions. Additionally, there the employee had a lengthy criminal history unlikely to be discovered by the employer's "sketchy and meager" employment application. Here, Young hired Jorgensen after having known him in the entertainment industry for four years prior and Jorgensen represented that he did not have a criminal history, which was true. (Def. SOMF., ECF No. 112-2, ¶¶ 8, 19). As such, the Court sees no reason to apply a heightened duty of care in this case, which has not even been applied in caregiver cases. *See Davis v. Devereux Found.*, 37 A.3d 469, 481 (N.J. 2012) ("[T]his Court has consistently applied traditional principles of due care and foreseeability to cases involving *in loco parentis* relationships, rather than adopting a "non-delegable" or absolute duty such as that urged by plaintiff here.").

Turning to whether a general duty of care existed, the critical factor is reasonable foreseeability. Yet, here, Plaintiffs have pointed to no evidence to support that Defendants knew, or could have foreseen, Jorgensen's proclivity to engage in inappropriate relationships with minors to even support the imposition of a general duty of care. Indeed, what is undisputed is that: (1) Jorgensen and Young had a longstanding relationship, in which Young only knew of Jorgensen to act appropriately with fans, (Def. SOMF, ECF No. 112-2, ¶ 8, 13); (2) to become a contract musician for Owl City, Jorgeson could not have a criminal history, which he did not have, (Def. SOMF, ECF No. 112-2, ¶ 18–19); (3) by virtue of his Christian faith, Young wanted his employees to follow a stricter moral standard than that of typical musical tours, (Def. SOMF, ECF No. 112-2, ¶ 20); (4) no individual Defendant was responsible for supervising contract musicians when they were not working, (Def. SOMF, ECF No. 112-2, ¶ 22); and (5) no one, including K.G.'s own mother who would accompany her to Owl City concerts, knew of the inappropriate relationship between K.G. and Jorgensen until K.G. brought it to light on December 6, 2013. (Def. SOMF, ECF No. 112-2, ¶¶ 24, 31; Young Dep., ECF No. 112-3, Ex. 1 at 60:6–10; Bursky Dep., ECF No. 112-3, Ex. 12 at 59:1–60:12; Brennan Dep., ECF No. 112-3, Ex. 19 at 56:11–57:6). Billups' report and testimony does not alter the Court's conclusion as Jorgensen's proclivity to engage in inappropriate relationships was simply not foreseeable on this record.

To have a duty in the negligent hiring, retention, and supervision context, Defendants must have had notice or knowledge of Jorgensen's dangerous attributes or unfitness—here, Jorgensen's proclivity for engaging in inappropriate relationships with minors—and they simply did not in this case. The evidence to which Plaintiff relies on to show such notice or knowledge is unpersuasive. That the mother of an Owl City fan commented on Owl City's Instagram page in April 2013 regarding Jorgensen's inappropriate relationship with her own minor daughter does not, in and of

itself, create a duty on Defendants. There is nothing in the record suggesting that Defendants saw the message and ignored it. Indeed, Defendants all denied seeing the comment. (Young Dep., ECF No. 112-3, Ex. 1 at 61:20–24; Bursky Dep., ECF No. 112-3, Ex. 12 at 89:21–90:21, 92:8–13; Johnson Dep., ECF No. 112-3, Ex. 13 at 11:10–14; Brennan Dep., ECF No. 112-3, Ex. 19 at 39:14–19). And the comment on Owl City's Instagram, which replied to another user, was one of many, as is typical of the Instagram pages of popular musical bands. The Court will not impose a duty on public figures and affiliated entities, like Defendants, to exhaustively review the comments' section of every public post they make to mine for potential information on their employees. And Plaintiffs' have cited to no case requiring as much.

Plaintiffs also point to an interaction between Young and Jorgensen during which Jorgensen, while on a video call with K.G. pointed the laptop to Young, and Young asked Jorgensen "is that the girl?" or "have you spoken to the girl recently?" (K.G. Dep., ECF No. 112-3, Ex. 3 at 74:8–80:12). Even assuming this interaction occurred, though it is disputed, (*see* Young Dep., ECF No. 112-3, Ex. 1 at 149:13–16), it is far too speculative to assume Young was talking about K.G. Similarly speculative is Plaintiffs' allegation that Jorgensen told K.G. that Young gave him anti-anxiety medication because he was nervous about meeting K.G. and reliance on Young having admitted he walked to the beach the day of the Atlantic City beach incident. (K.G. Dep., ECF No. 112-3, Ex. 3 at 81:21–82:5; Young Dep., ECF No. 112-3, Ex. 1 at 165:22–23). The Court will not speculate from Young's purported question that he knew of the inappropriate relationship between Jorgensen and K.G., that the anti-anxiety medication Young gave to Jorgensen had anything to do with K.G., and that Young, having admitted to walking on the beach in Atlantic City on the day of the incident, meant he saw Jorgensen and K.G. that night after the concert. *See Rakowski v. Brigantine*, No. 19-21847, 2022 WL 326992, at *1 (D.N.J. Feb. 3, 2022) ("[M]ere

allegations, conclusions, conjecture, and speculation will not defeat summary judgment."); *Martin v. Unknown U.S. Marshals,* 965 F.Supp.2d 502, 527 (D.N.J.2013) (noting that bare allegations or speculation not enough to defeat summary judgment).

To be sure, courts have not deemed employers negligent under similar circumstances. In *G.A.-H.*, the New Jersey Supreme Court summarily dismissed the plaintiff's negligent hiring, retention, training, and supervision claim finding that "[a]lthough plaintiff has pointed to various actions by [the employee] that occurred at work, the only tort in this case is [the employee's] off-duty abuse of plaintiff." 210 A.3d at 917. The Court explained "[t]hat [the employee] bragged about having a younger "girlfriend" at work and . . . drove a[n] [employer-issued] ambulance to plaintiff's bus stop does not make [the employer] negligent in retaining, training, or supervising [the employee]." *Id.*; *see also Doe 7015 v. Elektra Ent. Grp. Inc.*, No. 21 Civ. 6868, 2023 WL 2744102, at *6-7 (S.D.N.Y. Mar. 31, 2023) (rejecting claims of negligent hiring and supervision of band member who sexually abused a minor over a two-year period because the assaults occurred at the band member's apartment, the record label defendants did not have an independent relationship with the victim, the defendants had simply hired the band member as a musician and supervised him in that capacity–not in his personal relationships–and the inappropriate relationship began one year before band member signed with music label); *J.P. by S.A. v. Lawrence Township Board of Education*, No. A-0180-20, 2022 WL 816800, at *6 (N.J. App. Div. March 18, 2022) (affirming grant of summary judgment on negligent hiring, retention, and supervision claim because the school had no reason to know teacher might harm children because all evidence pointed to the contrary as teacher had received glowing reviews and he did not have a criminal history); *D.T. v. Hunderton Medical Center*, No. L0961-07, 2012 WL 4448774, at *11 (N.J. App. Div. Sept. 27, 2012) (affirming grant of summary judgment on negligent hiring, retention, and

supervision claim because the hospital conducted background check and nothing in employment record revealed that the employee would engage in a sexual relationship with a teenage volunteer). And in *Maddox v. City of Newark*, this Court too concluded that the employer did not negligently hire and retain an employee who discriminated against the plaintiff because the employer performed a background check before hiring the employee and the employee received positive reviews from his former employer. 50 F. Supp. 3d 606, 636 (D.N.J. 2014) (McNulty, J.). Moreover, this Court noted that even assuming that the employer could have learned of an internal incident that had happened at the employee's prior job, the plaintiff had not put forward any evidence that the employee "discriminated against her on any basis remotely related to the alleged incident at [the employee's prior job]." *Id.*; *cf. Lingar,* 692 A.2d at 65–66 (finding triable issue where employee's prior drug convictions were a matter of public record).

As evidenced by these cases, "a detailed inquiry into an employee's personal history or outside activities is not generally required." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 492 (3d Cir. 2013). Indeed, no written policy or guideline in place as Plaintiff's expert urges was required to meet industry standards would have uncovered Jorgensen's propensities to engage in inappropriate relationships nor likely prevented it given that even the illegality of his actions did not dissuade him. *See Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 369-70 (D.N.J. 2013) (granting summary judgment on plaintiff's negligent hiring, supervision, and retention claim because "[w]hile the evidentiary record reflects the Plaintiffs' expert's opinion that the Sea Isle City Police Department failed put in place certain policies regarding the treatment of hypothermia victims, nothing in the record reflects any knowledge of [the employees'] unfitness, incompetence, or dangerous attributes as employees of the police department.").

As Defendants did not have knowledge of Jorgensen's dangerous attributes or unfitness,

no duty arose to protect against his inappropriate actions with K.G. Thus, Defendants are entitled to summary judgment on Count Four.

    2.   <u>Defendants are Entitled to Summary Judgment on Plaintiffs' Gross Negligence Claim.</u>

Defendants are also entitled to summary judgment on Plaintiffs' gross negligence claim for the same reason as they are for negligent hiring, retention, and supervision. "[T]he difference between 'gross' and 'ordinary' negligence is one of degree rather than of quality." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442–43 (D.N.J. 2014) (quoting *Fernicola v. Pheasant Run at Barnegat,* No. 23-08, 2010 WL 2794074, *2 (N.J. App. Div. July 2, 2010)). Thus, the same elements apply as ordinary negligence: (1) the existence of a duty owed by Defendants towards Plaintiffs; (2) a breach of that duty by Defendants; (3) that Defendants' breach caused Plaintiffs' injuries; and (4) that Plaintiffs suffered damages as a result. *Powell v. Seton Hall Univ.*, No. 21-13709, 2022 WL 1224959, at *4 (D.N.J. Apr. 26, 2022). Gross negligence is "behavior which constitutes indifference to consequences." *Id.* (citation omitted). Indeed, "[g]ross negligence requires substantial proof beyond simple negligence; it requires wanton or reckless disregard for the safety of others." *Id.* (citation omitted). "It is 'commonly associated with egregious conduct.'" *Bartlett v. Push to Walk*, No. 15-7167, 2018 WL 1726262, at *8 (D.N.J. Apr. 10, 2018) (quoting *Kain v. Gloucester City*, 94 A.3d 937, 947 (N.J. App. Div. 2014)).

The Court has already determined that Defendants did not owe a duty to Plaintiffs. There is also no evidence that Defendants were indifferent. Conversely, the record provides that they were entirely unaware of Jorgensen's behavior. As such, Defendants are entitled to summary judgment on Count Five.

    3.   <u>Defendant is Entitled to Summary Judgment on Plaintiffs' *Per Quod* Claim.</u>

Because the viability of B.G.'s *per quod* claim derives from K.G.'s claims, which have been dismissed, summary judgment must be granted on Count Six.

Under New Jersey law, parents may recover damages for the loss of services, earnings, and medical expenditures resulting from injuries to a minor child. *Gould ex rel. Gould v. TJX Companies, Inc.*, No. 11-288, 2013 WL 1288167, at *5 (D.N.J. Mar. 26, 2013). Yet, the *per quod* claim is derivative, not a separate cause of action. *See Lockhart v. Willingboro High Sch.*, No. 14-3701, 2017 WL 4364180, at *8 (D.N.J. Sept. 29, 2017) ("A *per quod* claim is a derivative cause of action whose viability depends on the existence of tortious conduct against the injured spouse.") (citation omitted). As K.G.'s underlying claims as to these Defendants have been dismissed, B.G.'s *per quod* claim for damages also fails. *See id.* (dismissing *per quod* claim because underlying common law tort claims had failed); *Reilly v. Prudential Prop. & Cas. Ins. Co.*, 653 F. Supp. 725, 735 (D.N.J. 1987) (explaining since plaintiff's tort claims were dismissed, there was no underlying tort on which a *per quod* claim could rest); *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 349 (D.N.J. 2006) (concluding because the plaintiffs have not alleged a cognizable tort claim, the spouse could not maintain her derivative loss of consortium claim).

Thus, Defendants are entitled to summary judgment on Count Six.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Preclude Plaintiffs' Expert is **GRANTED** in part and **DENIED** in part and Defendants' Motion for Summary Judgment is **GRANTED** in its entirety. (ECF Nos. 112–13). An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**

22